UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| OMARI TAHIR,<br><br>                Plaintiff,<br>    v.<br><br>KSHAMA SAWANT, et al.,<br><br>                Defendants. | CASE NO. C16-0413JLR<br><br>ORDER |

## I. INTRODUCTION

Before the court is Defendants Kshama Sawant, Seattle City Light ("SCL"), and Bruce Harrell's (collectively, "Defendants") motion for summary judgment. (Mot. (Dkt. # 37).) Plaintiff Omari Tahir did not respond to the motion. (*See* Dkt.) The court has reviewed the motion, the relevant portions of the record, and the applicable law.

//

//

//

ORDER - 1

1  Considering itself fully advised,[1] the court GRANTS Defendants' motion and
2  DISMISSES this case with prejudice.

## II.   BACKGROUND

### A.   Allegations

This is a civil rights lawsuit that pertains to property located at 2314 East Spring Street in Seattle's Central District ("the property"). (Am. Compl. (Dkt. # 29) ¶ 12.) Mr. Tahir, who is proceeding *pro se* and *in forma pauperis* (*see* 3/28/16 Order (Dkt. # 2)), alleges that Defendants discriminated against him on the basis of his race (*see, e.g.*, Am. Compl. ¶¶ 19-20, 24, 27), disability (*see, e.g., id.* ¶ 21), and status as a military veteran (*see, e.g., id.*). As an SCL customer (*id.* ¶ 12), Mr. Tahir alleges that he endured harm when SCL cut service to the property without proper notice (*id.* ¶¶ 18, 24). He faults Ms. Sawant and Mr. Harrell, both of whom are Seattle City Council members, for using "utility companies such as [SCL] for the sole purpose to oppress, suppress Seattle's Black community activism against gentrification, vote dilution, police brutality, cultural awareness, discriminatory practices in federal financial programs, by and through, disconnecting utilities such as water and lights, etc."[2] (*Id.* ¶ 20.) He seeks monetary, declaratory, and injunctive relief. (*See id.* at 6-7 (Prayer for Relief).)

---

[1] Mr. Tahir did not respond to Defendants' motion and Defendants do not request oral argument. The court accordingly declines to hear oral argument on Defendants' motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

[2] Mr. Tahir also sued MidTown Limited Partners ("MidTown") and Margaret Delaney, the managing director of Midtown. (Compl. (Dkt. # 3) ¶¶ 6-7.) The court dismissed Mr. Tahir's claims against MidTown and Ms. Delaney without prejudice and without leave to amend. (*See* 11/18/16 Order (Dkt. # 28) at 3-5 (dismissing the claims asserted against MidTown and Ms. Delaney in the initial complaint and granting leave to amend); Am. Compl.; 1/5/17 Order (Dkt.

B.   **Factual Record**

MidTown owns the property and leased it to UMOJA Fest Peace Center ("UMOJA"). (Bangasser Decl. (Dkt. # 38-3) ¶¶ 2-4, 6, Ex. A ("Lease Agmt.") at 1.) The lease began on March 6, 2012 (Lease Agmt. at 1), and expired on September 30, 2014 (Bangasser Decl. ¶ 6, Ex. B ("Disclaimer of Rts.") ¶ 2). UMOJA had fully vacated the property prior to January 1, 2016. (*Id.* ¶ 3.) It has since disclaimed all rights under the lease and any interest in the property. (*Id.* ¶ 2.) However, Mr. Tahir continued to occupy the property and consume utilities provided by SCL. (Bangasser Decl. ¶ 7.)

During its tenancy, UMOJA received SCL bills at the property, and those bills were in UMOJA's name. (Denet-Weems Decl. (Dkt. # 38-4) ¶ 5, Ex. A at 2.) On August 11, 2015, after UMOJA's lease terminated, MidTown requested that SCL change the mailing address from UMOJA's address to MidTown's address. (*Id.* ¶ 8, Ex. D.) SCL accordingly changed the mailing address in its records and began sending utility bills to MidTown. (*Id.*; *see also* Am. Compl. ¶ 18 (indicating that Mr. Tahir ceased receiving SCL bills at the property in October 2015).) Although Mr. Tahir alleges that he paid SCL bills for the property since 2007 (Am. Compl. ¶ 18), his name does not appear anywhere in SCL's records (*see* Denet-Weems Decl. ¶¶ 5-8, Exs. A-D.) Dating back to at least April 2012, UMOJA's SCL account for the property was continuously delinquent. (*Id.* ¶¶ 7, 9, Ex. C at 1-6.)

//

---

# 36) at 2-3 (dismissing the claims asserted against MidTown and Ms. Delaney in the amended complaint without prejudice and without leave to amend).)

ORDER - 3

On February 1, 2016, Mr. Tahir called SCL and spoke with Daphne Jiles, an SCL employee in the credit department. (Jiles Decl. (Dkt. # 38-6) ¶¶ 2-5, Ex. A ("SCL Cust. Svc. Records").) At Mr. Tahir's request, Ms. Jiles removed MidTown's mailing address from the account and restored the property's mailing address. (SCL Cust. Svc. Records at 2.) Ms. Jiles informed Mr. Tahir that the account was delinquent and he needed to pay $350.00—approximately half of the delinquent sum—to avoid discontinuation of service. (Jiles Decl. ¶ 6; SCL Cust. Svc. Records at 2; Denet-Weems Decl. Ex. C at 1, 6.) Mr. Tahir was argumentative and mentioned a lawsuit against MidTown, but eventually he agreed to a payment plan to avoid discontinuation of service. (SCL Cust. Svc. Records at 2.) As the first step in that plan, Mr. Tahir agreed to pay $350.00 by February 17, 2016. (*Id.*) On February 16, 2016, someone—presumably Mr. Tahir—posted a $200.00 cash payment to the property's SCL account. (Denet-Weems Decl. Ex. C at 6.)

Because this $200.00 payment fell short of the payment plan, SCL disconnected services to the property on March 2, 2016. (*Id.*; SCL Cust. Svc. Records at 1-2; Jiles Decl. ¶ 8.) That day, Mr. Tahir called SCL multiple times and spoke with Ms. Jiles, among other SCL employees. (SCL Cust. Svc. Records at 1-2; Jiles Decl. ¶ 9.) Ms. Jiles informed Mr. Tahir that the services at the property had been shut off due to a failure to meet the payment plan. (SCL Cust. Svc. Records at 1-2; Jiles Decl. ¶ 9.) Mr. Tahir indicated that he did not intend to pay the outstanding balance. (Jiles Decl. ¶ 10.) SCL has not received payment since February 16, 2016, and the account had a receivable balance of $1,047.64 as of May 31, 2017. (Denet-Weems Decl. ¶ 12.)

//

Based on her 22 years of experience in the customer service department at SCL, Ms. Jiles indicates that SCL's treatment of the account at issue was typical practice. (Jiles Decl. ¶ 12.) She also attests that when she spoke with Mr. Tahir in 2016, she had no knowledge of Mr. Tahir's involvement with the African-American community or the various causes he supports. (*Id.*)

### III. ANALYSIS

Defendants argue that there is no evidence SCL discriminated against Mr. Tahir due to his membership in a protected class (Mot. at 11-15) and no viable theory of liability against Ms. Sawant and Mr. Harrell (*id.* at 15-17). The court addresses those contentions in turn.

#### A. Legal Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing that there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323.

If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment. *Galen*, 477 F.3d at 658. The non-moving party may make

this showing by use of affidavits, depositions, answers to interrogatories, or requests for admissions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Only disputes over the facts that might affect the outcome of the suit under the governing law are "material" and will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. As framed by the Supreme Court, the ultimate question on a summary judgment motion is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

Mr. Tahir failed to respond to Defendants' motion for summary judgment. (*See* Dkt.) "The summary judgment rules apply with equal force to *pro se* litigants because they 'must follow the same rules of procedure that govern other litigants.'" *Schwartz v. World Savings Bank*, No. C11-0631JLR, 2012 WL 993295, at *3 (W.D. Wash. Mar. 23, 2012) (quoting *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1995)). This standard comes from the Ninth Circuit's determination that "*pro se* litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record." *Jacobsen v. Filler*, 790 F.2d 1362, 1365 (9th Cir. 1986) (concluding that *pro se* parties are not entitled to notice from the court of Rule 56's evidentiary standards). The Ninth Circuit has cautioned, however, that "a nonmoving party's failure to comply with the local rules does not excuse the moving party's duty under Rule 56 to demonstrate its entitlement to judgment as a matter of law." *Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003);

1 *see also* Local Rules W.D. Wash. LCR 7(b)(2) ("Except for motions for summary

2 judgment, if a party fails to file papers in opposition to a motion, such failure may be

3 considered by the court as an admission that the motion has merit.").

4 Heeding the Local Civil Rules and the requirements of *Martinez*, the court

5 analyzes Defendants' motion for summary judgment on the merits. "However, where a

6 defendant has met its burden of demonstrating an absence of material factual issues for

7 trial, the court cannot create an issue for a plaintiff who has not submitted any

8 countervailing evidence." *See Rodarte v. Trident Seafoods Corp.*, No. C13-1028JLR,

9 2014 WL 4113599, at *3 (W.D. Wash. Aug. 20, 2014).

**B.   SCL**

11 Under any conceptualization of Mr. Tahir's amorphous discrimination claims, he

12 must submit evidence suggesting that SCL acted with discriminatory intent or that its

13 actions had a discriminatory impact.[3] *See, e.g., Lee v. City of L.A.*, 250 F.3d 668, 686-87

14 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d

15 1119, 1125-26 (9th Cir. 2002). In his amended complaint, Mr. Tahir cites two publicly

16 available pieces of evidence that pertain to discrimination: a 1968 report on civil disorder

17 //

---

[3] Mr. Tahir's claim against SCL appears to suffer from several legal infirmities. For instance, municipalities constitute "persons" under 42 U.S.C. § 1983, *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 426 U.S. 658, 690 (1978), but their departments do not, *see Nelson v. Cty. of Sacramento*, 926 F. Supp. 2d 1159, 1170 (E.D. Cal. 2013). Furthermore, municipalities can only be sued under Section 1983 where "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 426 U.S. at 691. Nonetheless, in accordance with its duty to liberally construe Mr. Tahir's *pro se* filings, *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988), the court addresses the core evidentiary issue under any theory of discrimination: whether the record contains sufficient evidence of discrimination to raise a genuine dispute regarding that material fact.

and City of Seattle Mayor Ed Murray's alleged statement that racism is a major problem in Seattle. (Am. Compl. ¶ 20.) Even assuming this evidence is judicially noticeable, *see* Fed. R. Evid. 201, it does not implicate SCL and is irrelevant to this case.

The evidence categorically points to a lack of discrimination by SCL. Defendants show that SCL changed the mailing address for the bills upon a request from MidTown (Denet-Weems Decl. Ex. D), sent bills to that address until Mr. Tahir requested otherwise (SCL Cust. Svc. Records at 2), offered Mr. Tahir an opportunity to cure the underpayment on the SCL account (Jiles Decl. ¶ 6; SCL Cust. Svc. Records at 2), and terminated services only after Mr. Tahir accepted the payment plan and failed to comply with its terms (Denet-Weems Decl. Ex. C at 6; SCL Cust. Svc. Records at 1-2; Jiles Decl. ¶ 8). SCL took all of these actions pursuant to its typical practice.[4] (Jiles Decl. ¶ 12). Furthermore, there is no evidence in the record that SCL's agents were aware of Mr. Tahir's alleged membership in any protected classes (*cf. id.* ¶ 11), and the court therefore cannot infer discriminatory intent. Finally, there is no circumstantial evidence in the

//

---

[4] Indeed, many of the actions—by SCL and others—with which Mr. Tahir takes issue are not only typical, they are legally obliged or authorized. *See, e.g.*, Seattle, Wash., Mun. Code § 21.49.100(B) ("In the absence of an application for service or signed contract, the furnishing of electric service by the Department and the use of such service by the customer shall constitute a contract and the customer agrees to pay for such electric service under the rates, terms and provisions of the applicable rate ordinance as amended from time to time. . . . In cases where the customer is a tenant, the property owner or his agent must provide notice to the Department of the dates a tenant starts and ends occupancy or has control of the premises. . . . Failure of a property owner to provide such notice may result in billing charges to the property owner for a tenant's use of electric service. . . . The customer is liable for all services rendered at the published rate and failure of the utility to bill does not release the customer from such liability. . . . In the event that a customer uses the electric service provided by the Department but fails to receive billing for service, it shall be the customer's responsibility to notify the Department of the failure to receive a bill.").

ORDER - 8

form of statistics or historical context that suggest SCL's discriminatory intent toward or discriminatory impact on African Americans, disabled people, or veterans. (*See* Am. Compl. ¶¶ 20-21.) Accordingly, the court concludes that Mr. Tahir's discrimination claims against SCL fail as a matter of law and grants summary judgment in favor of SCL.

### C.     Ms. Sawant and Mr. Harrell

As Defendants argue, Mr. Tahir identifies no possible theories of liability as to Ms. Sawant and Mr. Harrell. (*See generally* Am. Compl.) Although he appears to sue them for damages in their official capacities (*see, e.g., id.* ¶ 20), the City of Seattle is the appropriate party for such an action, *see* RCW 4.96.010(1). Moreover, Mr. Tahir does not identify any acts that Ms. Sawant or Mr. Harrell took in any capacity. (*See generally id.*) Finally, the lack of evidence of discrimination that the court identified above also applies to Mr. Tahir's claims against Ms. Sawant and Mr. Harrell. *See supra* § III.B. Because there is no evidence of discrimination, no identifiable theory of liability against Ms. Sawant and Mr. Harrell under which Mr. Tahir might recover, and no evidence of any action taken at all by either Ms. Sawant or Mr. Harrell, the court grants summary judgment in favor of Ms. Sawant and Mr. Harrell.

//
//
//
//
//
//

## IV. CONCLUSION

Based on the foregoing analysis, the court GRANTS Defendants' motion for summary judgment (Dkt. # 37) and DISMISSES Mr. Tahir's claims against Defendants with prejudice.

Dated this 17th day of July, 2017.

JAMES L. ROBART
United States District Judge